Charles M. Louderback, SBN 88788
Stacey L. Pratt, SBN 124892
LOUDERBACK LAW GROUP
44 Montgomery Street, Suite 2970
San Francisco, CA 94104
Telephone (415) 615-0200
Facsimile: (415) 795-4775
E-Mail:  clouderback@louderbackgroup.com
         spratt@louderbackgroup.com

Attorneys for Plaintiff
PAUL J. GAYNOR

THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| PAUL J. GAYNOR,<br><br>         Plaintiff,<br><br> v.<br><br>AHMAD CHATILA, an individual and BRIAN WUEBBELS, an individual,<br><br>         Defendants. | Case No._____<br><br>**COMPLAINT FOR DAMAGES**<br><br>**VIOLATION OF 15 U.S.C. § 78u-6 (DODD-FRANK);**<br>**DEFAMATION**<br><br><br>**JURY TRIAL DEMANDED** |
|---|---|

  Plaintiff Paul J. Gaynor ("Gaynor") alleges claims against Ahmad Chatila and Brian Wuebbels, as follows:

**PARTIES**

  1. Plaintiff Paul Gaynor is a former Executive Vice President of Sun Edison, Inc. ("SUNE"), a former employee of NVT, LLC ("NVT"), and the former CEO of First Wind Holdings, LLC ("First Wind"), prior to its acquisition by SUNE.  SUNE is a corporation duly organized and existing under the laws of the State of Delaware.

  2. SUNE maintains its operational headquarters in Belmont, California, and its corporate headquarters in Maryland Heights, Missouri.  TerraForm Power, Inc. ("TERP") is a Delaware-

incorporated business that is a controlled subsidiary of SUNE.  As of September 30, 2015, SUNE owned 43% of the total outstanding shares of TERP and controlled approximately 88% of TERP's voting power.  TerraForm Global, Inc. ("GLBL") is a Delaware-incorporated business that is a controlled subsidiary of SUNE.  As of September 30, 2015, SUNE owned 36% of the total outstanding shares of GLBL and controlled approximately 98% of GLBL's voting power.  Generally speaking and prior to the bankruptcy filing of SUNE, SUNE's business model was to develop renewable energy projects such as solar and wind installations, from residential to large utility scale projects.  SUNE operated in over 20 countries.

3. The utility scale business that Mr. Gaynor was involved with at First Wind and then SUNE is capital-intensive, and the development process for such projects happens over many years.  SUNE's business model was designed to sell the projects that were successfully developed.  Prior to SUNE's bankruptcy, SUNE, GLBL, and TERP had a general practice whereby SUNE developed projects, and then sold the projects to TERP and GLBL.  This allowed SUNE to rapidly realize a capital infusion from its completed projects, which it could redeploy into future projects.  TERP and GLBL, in turn, acted as "yield cos" and collected an ongoing stream of revenue from these projects purchased from SUNE.

4. At all relevant times, Defendant Ahmad Chatila was the President and Chief Executive Officer of SUNE and a member of SUNE's Board of Directors.  Mr. Chatila was the Chairman of both TERP's Board of Directors and GLBL's Board of Directors when the entities were registered.  On November 20, 2015, Mr. Chatila resigned as the Chairman of GLBL's Board of Directors and TERP's Board of Directors, but he remained a member of both the GLBL and TERP Boards.  On June 22, 2016, SUNE announced that Mr. Chatila would resign as SUNE's board member and SUNE's Chief Executive Officer.

5. At all relevant times, Defendant Brian Wuebbels was the Executive Vice President and Chief Financial Officer for SUNE.  Since November 20, 2015, until his termination, Mr. Wuebbels has served as the President and Chief Executive Officer of both GLBL and TERP.  On

March 11, 2016, SUNE announced that, by April 4, 2016, Mr. Wuebbels would no longer serve as SUNE's Chief Financial Officer, Chief Administration Officer, and Chief Accounting Officer. He left his post as of June 9, 2016.

## JURISDICTIONAL STATEMENT

### Jurisdiction

6. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367 and 15 U.S.C. § 78u-6.

### Venue

7. Venue lies in this district because a substantial part of the events giving rise to these claims occurred in this district.

## FACTUAL ALLEGATIONS

8. Mr. Gaynor's concerns about the accuracy and propriety of SUNE's public financial disclosures began in the late summer of 2015. On August 27, 2015 at SUNE's Mid-Quarter Board of Directors Meeting in Belmont, California, SUNE management, including Chatila and Wuebbels, reported to the Board regarding SUNE's anticipated substantial burn rate in the fourth quarter of 2015 and in the first quarter of 2016.

9. On September 2, 2015, Mr. Chatila stated during a Bloomberg interview at SUNE's Belmont, California headquarters that SUNE would begin generating positive cash flow in late 2015 or early 2016. Mr. Chatila's public prediction in the Bloomberg interview that SUNE would generate positive cash flow directly contradicted his private assessment to the SUNE Board of Directors less than a week earlier.

10. During an October 7, 2015 business update webcast that was publicly available, Mr. Chatila stated that SUNE "remains well capitalized with adequate liquidity." In the same webcast, Mr. Wuebbels said that "excluding the cash from TerraForm [Power] and Global, the cash available at [SUNE] was standing at approximately $1.4 billion at the end of the [third] quarter, up from $900 million at the end of the second quarter." In meetings and conversations on this day and following

these October 7, 2015 meetings, Mr. Gaynor expressed significant concerns about how cash was being depicted by the SUNE CEO and CFO. Specifically, he continually challenged Mr. Wuebbels on his depiction of SUNE's liquidity because Mr. Gaynor felt that Mr. Wuebbels had grossly overstated SUNE's true liquidity position.

11. Following these events, on several occasions in October and November of 2015, Mr. Gaynor relayed concerns about SUNE's liquidity position to SUNE's Board of Directors and other members of SUNE's senior management, including during an October 14, 2015 call with SUNE Board Chairman Emmanuel Hernandez. Mr. Gaynor, along with the support of other senior executives of SUNE[1], stated his objections to the representations of Mr. Chatila and Mr. Wuebbels regarding the company's liquidity position; specifically, Mr. Gaynor informed Mr. Hernandez that he was concerned that SUNE's liquidity was substantially weaker than the figures SUNE had publicly disclosed and that Mr. Chatila and Mr. Wuebbels had not fully disclosed SUNE's liquidity situation to SUNE's Board of Directors or to its investors. Additionally, Mr. Gaynor informed Mr. Hernandez that SUNE's liquidity issues might prevent SUNE from meeting its short-term obligations as they came due and that, as a result, SUNE could face a near-term liquidity crisis. Mr. Gaynor explained to Mr. Hernandez that this was the third liquidity crisis that had taken place since Mr. Gaynor joined SUNE, which was only nine months prior, at the end of January, 2015. Mr. Gaynor and other executives were calling for an immediate change of leadership in the CEO and CFO roles at SUNE.

12. Over the next week or so, Mr. Gaynor had similar conversations with board directors Steve Tesoriere, Randy Zwirn, and audit committee chair Georgeanne Proctor. Three EVPs of SUNE and the CFO of TERP/GLBL requested an investigation into SUNE's liquidity position and, relatedly, disclosures made to the public regarding the SUNE's liquidity position.

---

[1] Mr. Carlos Domenech, EVP of SUNE and CEO of TERP, Mr. Pancho Perez, EVP and Chief Operating Officer of SUNE, and Mr. Alex Hernandez, CFO of TERP.

13. In response to this request, SUNE's Board called a special meeting in which the Board and SUNE senior management—including Defendants Chatila and Wuebbels—refused to consider seriously or address Mr. Gaynor's concerns regarding SUNE's liquidity.

14. One of the demands on SUNE's liquidity was the contractual earnout that was owed to First Wind ("FW") in the fourth quarter of 2015 as part of its sale to SUNE and TERP. Mr. Gaynor had a direct financial interest in this payment. After senior management meetings that took place in Bethesda, Maryland on October 19 and 20, 2015, Mr. Gaynor volunteered to discuss a restructuring of the FW earnout with its former owners, but in doing so asked to be indemnified by the company, and an indemnity was subsequently put in place by SUNE for him. During that discussion, Mr. Chatila told Mr. Gaynor: "you might hear things about me not wanting to pay the earnout, but don't believe any of it ok?"

15. On October 26, 2015, Mr. Chatila and Mr. Wuebbels delivered a presentation concerning SUNE's liquidity position at the SunEdison Board of Directors Meeting in Belmont, California. Mr. Gaynor attended the presentation by phone after travelling to California at the request of the Chairman, along with the other executives concerned about SUNE's liquidity issues.

16. After the presentation finished, Mr. Gaynor stated that the financial management of the company was putting the company at risk and that the financial forecast presented to the Board by Mr. Chatila and Mr. Wuebbels was not realistic, depicted a more positive outlook than previously presented, and relied on a variety of problematic assumptions. During a call that Mr. Gaynor had with Manny Hernandez on October 28, 2015, Mr. Hernandez summarized the results of board meetings that just occurred: no action was taken regarding leadership changes and the liquidity issues were being looked into. In order to appease Mr. Gaynor, Mr. Hernandez asked Mr. Gaynor to trust him (Mr. Hernandez stated: "Paul, I need you to let me draw a trust me card").

17. On November 3, 2015, Mr. Gaynor learned that Mr. Domenech and Mr. Perez had been asked by Mr. Chatila to do everything possible to stop the FW earnout payments from occurring as they were a significant financial liability of SUNE and TERP. Mr. Gaynor was

summoned by Mr. Chatila to SUNE's offices in Belmont, CA to review the Global Utility business. At the meeting, Mr. Chatila cast the blame for the liquidity crisis on Mr. Gaynor and his group, and accused him of misrepresenting the FW earnout milestones.  It was clear to Mr. Gaynor that Mr. Chatila had created a negative narrative about Mr. Gaynor in order for Mr. Chatila to have someone to blame for SUNE's financial position (at that time).

18. On November 5, 2015, Mr. Gaynor emailed director Zwirn and audit committee chair Proctor advising he wanted to start a transition plan out of SUNE.  On November 9, 2015, Mr. Gaynor and Mr. Chatila had a call at the request of Mr. Hernandez, in which Mr. Chatila denied all of Mr. Gaynor's charges categorically, asked Mr. Gaynor to stay, and stated that he would remove Mr. Wuebbels as CFO.

**Chatila and Wuebbels Persist in Presenting False Information About SUNE's Financial Condition**

19. In SUNE's quarterly report for the third quarter of 2015, filed on November 9, 2015, SUNE reported that, together with its subsidiaries TERP and GLBL, it had a consolidated total of $2.393 billion in "cash and cash equivalents."  GLBL's quarterly report filed on November 13, 2015 disclosed $1.108 billion in "cash and cash equivalents;" TERP's quarterly report filed on November 9, 2015 disclosed $635 million in "cash and cash equivalents."  By simple arithmetic, these reports indicate that SUNE had approximately $650 million in cash and cash equivalents at the end of the third quarter of 2015.  ($2.393 billion minus $1.108 billion minus $635 million equals $650 million.) All of these figures were represented in the public filings to be unrestricted cash not committed to construction projects, to be held for sale, or otherwise restricted.  Despite this, in SUNE's Third Quarter 2015 Earnings Conference Call on November 10, 2015, Mr. Wuebbels stated that SUNE had "sufficient liquidity" of "approximately $1.4 billion at the end of the quarter."

20. In fact, on November 10, 2015, the day after public filings indicating that SUNE had $650 million in unrestricted cash, and the same day that Mr. Wuebbels publicly stated that SUNE

had approximately $1.4 billion in cash, the unrestricted cash balance across SUNE and all of its subsidiaries was substantially less.

21. On an internal company wide call after the public third quarter conference call, a question was asked about the company's liquidity position and Mr. Chatila answered: "I am simply not concerned about cash being a danger to the company. Some people are and are talking about it but I am not." Thereafter, Mr. Hernandez asked Mr. Gaynor to stay with SUNE, told him that no CEO/CFO changes were expected, and that Mr. Gaynor needed to respect the office of the CEO and support the person in the office.

22. By late November, 2015, the unrestricted cash balance across SUNE and all of its subsidiaries continued to fall. Leading up to the Third Quarter 10-Q filing and in the immediate aftermath of the filing, SUNE was in a dire liquidity position as one of its subsidiaries was at risk of a mandatory prepayment of an outstanding margin loan amount.

**Searching For a Short-Term Liquidity Fix, SUNE Attempts to Coerce TERP and GLBL Into Transactions Not in Their Best Interest**

23. To address its mounting liquidity issues, SUNE brazenly forced transactions upon GLBL and TERP that were undertaken neither in good faith nor in the best interests of GLBL or TERP. Throughout these proposed transactions, Mr. Gaynor voiced significant concerns about the nature of the transactions.

24. Mr. Domenech and Mr. Perez informed Mr. Gaynor that at a TERP Conflicts Committee meeting, in which some of these transactions were discussed, Mr. Chatila suggested other ways for TERP to support SUNE, including prepayment for assets and an unsecured loan. The Committee rejected these SUNE-favorable proposals due to SUNE's precarious financial position.

25. Mr. Domenech and Mr. Perez also informed Mr. Gaynor that on November 19, 2015, the TERP Conflicts Committee refused to grant the Restriction Release unless SUNE were to convey something of value to TERP, such as giving up its control rights over TERP. Mr. Chatila responded that this was an unacceptable position and an "act of war." Mr. Chatila scheduled a special meeting

of the TERP Board to take place at 2:00 p.m. on the following day in California, and the agenda for the meeting involved the expansion of the TERP Board and the roles and responsibilities of any new directors.

### **SUNE's Consolidation of Power**

26.     On November 20, 2015, at meetings of the GLBL and TERP Boards in California, SUNE exercised its right as the majority owner of Class B Common Stock of GLBL and TERP, respectively, to designate new, SUNE-loyal, members to the GLBL and TERP Boards. After SUNE added the new SUNE-loyal members to the TERP and GLBL Boards, SUNE used its controlling influence to remove Messrs. Lerdal and Dahya from the GLBL and TERP Conflicts Committees and to replace them with SUNE loyalists.

27.     To further consolidate its control of GLBL and TERP, SUNE used its controlling power to terminate Mr. Domenech's employment as President and Chief Executive Officer of GLBL and TERP and to remove him from the GLBL and TERP Boards. Mr. Domenech was replaced as President and Chief Executive Officer of GLBL and TERP by Defendant Wuebbels – a longtime SUNE insider and the Executive Vice President and Chief Financial Officer of SUNE.

28.     SUNE also terminated Alex Hernandez, the then-Chief Financial Officer of TERP and GLBL, and thereafter, Francisco "Pancho" Perez, the Chief Operating Officer of SUNE, TERP, and GLBL, gave notice that he could not return to work under the current circumstances—namely, while SUNE persisted in misreporting its financial status, forcing self-dealing transactions on TERP and GLBL, and summarily terminating the employment of anyone who objected. On November 22, 2015, Mr. Gaynor emailed the Board with a request to formally start transitioning out of SUNE.

29.     Mr. Chatila put his own narrative gloss on the November 20, 2015 management changes during a November 23, 2015 internal company leadership call to discuss the departures of Mr. Domenech and Mr. Hernandez, in which he stated that if leaders were not rowing in the same direction as he was, "the whole organization is going to reject them" and "eat them alive." These comments were clearly aimed at Mr. Gaynor.

**SUNE Secretly Removes Mr. Gaynor from SUNE's Decision- Making Processes to Complete Self-Interested Transactions to the Detriment of TERP and GLBL**

30. Facing an acute and immediate liquidity crisis, but armed with control over GLBL and TERP, on November 20, 2015, SUNE proposed a self-dealing transaction in which one of its subsidiaries would sell solar projects in India to a GLBL subsidiary for approximately $231 million (the "India Solar Transaction"). Of the total consideration, $150 million was payable to SUNE on November 20, 2015 and $81 million was payable soon thereafter.

31. The revamped GLBL Conflicts Committee approved the India Solar Transaction only hours after its complete turnover in membership. On December 1, 2015, SUNE and GLBL agreed to amend the India Solar Transaction such that the full $231 million was immediately payable. SUNE thus successfully extracted another $81 million in cash from GLBL for its own immediate benefit without providing anything in return. In the same press release announcing these amendments, Mr. Chatila asserted that SUNE was taking aggressive steps to enhance the cash flow position of SUNE.

32. Throughout this process, Mr. Gaynor, who was charged with overseeing and conducting business transactions related to the India Solar Projects, was not informed of the deal. Mr. Gaynor and Mr. Chatila had a conversation after the events of November 20, 2015 and informed Mr. Gaynor that SUNE had paid off the margin loan. When asked how that was accomplished, given SUNE's dire financial position, Mr. Chatila told Mr. Gaynor that he'd find out the following Monday in conjunction with a public announcement. On November 23, 2015, the sale of SUNE's India-based solar assets to GLBL was announced. It was clear that Mr. Chatila secretly worked with Mr. Gaynor's team to plan and execute the transaction without Mr. Gaynor's knowledge.

33. Predictably, SUNE rapidly used the cash that it received through the India Solar Transaction to make payments on outstanding loans in an attempt to address the liquidity issues the Company had previously denied. On November 24, 2015, just four days after GLBL paid $150 million to SUNE pursuant India Solar Transaction, SUNE's Borrower Sub reported paying off $95 million owed under its margin loan.

/ / /

### SUNE Terminates or Constructively Discharges Mr. Gaynor

34. Unbeknownst to Mr. Gaynor, after he questioned Mr. Chatila and the SUNE board about the prudence of SUNE's liquidity position and the legality of the Company's subsequent and public representations, executives within SUNE, including Mr. Chatila and Mr. Wuebbels, assaulted Mr. Gaynor's reputation and effectively removed him from the decision-making process of SUNE.

35. To various company employees, Mr. Chatila blamed Mr. Gaynor for SUNE's longstanding pattern of borrowing capital to cover for its financial hardships even though Mr. Gaynor had only been an employee of SUNE for approximately nine months. In an attempt to tarnish Mr. Gaynor's reputation and to undermine Mr. Gaynor's ability to effectively fulfill his duties, Mr. Chatila accused Mr. Gaynor of doctoring SUNE's financial records and misrepresenting the achievement of FW earnout milestones to SUNE employees who reported to Mr. Gaynor.

36. At other times during the October 2015 to December 2015 period, Mr. Chatila wholly bypassed Mr. Gaynor's authority and instead interacted directly with Mr. Gaynor's team, effectively eliminating Mr. Gaynor's management responsibilities, including Mr. Chatila's circumvention of Mr. Gaynor's authority in secretly planning and executing the India Solar Transaction.

37. On November 22, 2015, following SUNE's termination of Mr. Domenech and the resignation of several TERP and GLBL Board members, Mr. Gaynor emailed the Board of Directors of SUNE to explain that SUNE's dismantling of the TERP and GLBL boards to circumvent the Boards' independent judgment "violate[d] [his] core principles and beliefs in proper corporate governance" because he could not see how "SunEdison's decisions [were] in the best interests of TERP and GLBL shareholders and bondholders." In the same email, Mr. Gaynor highlighted that the termination of the board members "seem[ed] to ignore the root cause of why SunEdison is here in the first place and the stark reality of SunEdison's true financial position," and, also, the significant conflict of interest created through the management changes "now [that] the SunEdison CFO and deputy CFO [were] also the CEO/Interim CFO of TERP and GLBL."

38. On December 1, 2015, counsel for Mr. Gaynor contacted SUNE by email and reiterated Mr. Gaynor's significant concerns regarding SUNE's liquidity position and its problematic "solution" to these deeply troubling financial issues and past misreporting, which involved superficial transactions that merely propped up SUNE by harming shareholder interests at GLBL and TERP.

39. On December 14, 2015, Mr. Chatila summoned Mr. Gaynor to come to the office in Boston, asking him to "calm down, call off the lawyers, take the next 30-60 days off, and then come back and tell me what you want to do, even as a consultant," and Mr. Gaynor agreed.

40. On January 15, 2016, Stephen Cerrone, the Chief Human Resources Officer for SUNE, sent a letter to Mr. Gaynor in which he purported to "accept" Mr. Gaynor's "resignation" from employment. On information and belief, Mr. Chatila and Mr. Wuebbels instructed Mr. Cerrone to "accept" Mr. Gaynor's "resignation."

41. In response, Mr. Gaynor sent an e-mail to Mr. Crone on January 17, 2016, and stated "[a]s I have consistently made clear, I have been and remain willing to continue working with SunEdison, provided that the Company fixes the serious [liquidity and governance] issues that I and many other current and former senior executives have raised to the Company's attention." In the letter, Mr. Gaynor stated, however, that barring internal changes, SUNE's actions prevented him from serving effectively as a senior executive and materially diminished his duties and responsibilities.

42. On February 29, 2016, SUNE announced that it was "unable to timely file its Annual Report on Form 10-K for the fiscal year…." Within the filing, SUNE revealed that SUNE's independent counsel, "with the assistance of accounting and financial advisors," advised SUNE to seriously assess the allegations of "a current and a former employee of the Company" regarding the SUNE's financial statements, and that SUNE may have to "reassess the Company's liquidity position as well as the disclosures in the Form 10-K, including whether the Company may require

greater liquidity than previously anticipated and/or whether the sources are sufficient to meet its requirements."

43. On March 16, 2016, SUNE announced that it was unable to complete its Annual Report on Form 10-K within the 15-day extension period permitted under SEC rules because of "material weaknesses in its internal controls over financial reporting." Notably, SUNE's press release recognized that, the February 29, 2016 investigation into the accuracy of the SUNE's financial statements was ongoing and had not been finalized.

44. On March 29, 2016, SUNE again recognized the delayed filing of its Annual Report on Form 10-K, stating that it would likely be filed after March 30, 2016. Within this same press release, SUNE publicly acknowledged that it was facing "liquidity difficulties" and that "there is a substantial risk that SunEdison will soon seek bankruptcy protection."

45. On information and belief, SUNE and NVT —at the direction of Mr. Chatila and Mr. Wuebbels—now take the position that Mr. Gaynor's employment has terminated.  Since Mr. Gaynor never resigned his employment, and since Defendants and SUNE have not notified Mr. Gaynor that he has been terminated for Cause, they have terminated Mr. Gaynor without Cause.

**FIRST CAUSE OF ACTION**
**RETALIATION IN VIOLATION OF 15 U.S.C. § 78u-6 (DODD-FRANK)**
**(Against all Defendants)**

46. Plaintiff repeats and re-alleges the preceding allegations as if fully set forth herein.

47. Defendants were agents of Plaintiff's employer, SUNE.

48. Plaintiff made disclosures that were required or protected under the Sarbanes-Oxley Act of 2002 (15 U.S.C. 7201 et seq.), the Securities and Exchange Act of 1934, including and without limitation Section 10(b) of the Securities and Exchange Act of 1934 (15 U.S.C. 78l) and Section 17(a) of the Securities Act of 1933 (15 U.S.C. 77q), and other laws, rules, or regulations subject to the jurisdiction of the SEC, namely, the Plaintiff's disclosure of financial misreporting by Mr. Chatila and Mr. Wuebbels to SUNE's Board of Directors and in public statements and filings.

49. Plaintiff had both a subjectively and objectively reasonable belief that the conduct being reported violated a covered law, rule, or regulation.

50. Defendants, including but not limited to, SUNE's Boards of Directors, its CEO, and others, knew or suspected that Plaintiff engaged in such protected activity.

51. Defendants terminated or constructively discharged the Plaintiff.

52. Defendants discharged Plaintiff or created intolerable employment conditions constituting an effective discharge of the Plaintiff because of his protected activities.

53. As a proximate result of Defendants' actions against Plaintiff, as alleged above, the Plaintiff has been harmed in that he suffered the loss of wages, benefits, bonuses, and other money that he would have received if he had not been subjected to the retaliatory treatment. As a result of such conduct, Plaintiff has suffered damages in an amount according to proof.

**SECOND CAUSE OF ACTION**
**DEFAMATION**
**(Against Defendant Chatila)**

54. Plaintiff repeats and re-alleges the preceding allegations as if fully set forth herein.

55. As described above, Defendant Chatila willfully and without justification or privilege published false statements regarding Plaintiff to third persons, namely accusing the Plaintiff of doctoring internal financial records, misrepresenting the achievement of FW earnout milestones, and blaming Mr. Gaynor for SUNE's longstanding pattern of borrowing capital to pay for SUNE's financial mishaps.

56. These statements were disparaging and defamatory toward Plaintiff and had the natural tendency to injure the Plaintiff's professional reputation by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business conduct that has a natural tendency to lessen its profits, or which, by natural consequence, causes natural damage.

57. As a proximate result of Defendant Chatila's actions against Plaintiff, Plaintiff has been harmed in that he suffered the loss of wages, benefits, bonuses or other money. Plaintiff has

also been harmed in that he suffered humiliation, mental anguish, and emotional and physical distress. As a result of such conduct, Plaintiff has suffered damages in an amount according to proof.

58. The acts of Defendant Chatila were intentional, outrageous, despicable, oppressive, fraudulent, and one with ill will and intent to injure Plaintiff and to cause mental anguish, anxiety, and distress. Defendant Chatila's acts were done in conscious disregard of the severe risk of emotional harm to Plaintiff with the intent to injure Plaintiff, constituting oppression, fraud, or malice under California Civil Code § 3294, entitling Plaintiff to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A. Two times the amount of back pay otherwise owed to Plaintiff, with interest at the maximum legal rate;

B. For any other money judgment representing compensatory damages including lost wages, earnings, stock award vesting, retirement benefits and other employee benefits, and all other sums of money, together with interest at the maximum legal rate on these amounts, according to proof;

C. For a money judgment for mental pain and anguish and emotional distress, according to proof, with interest at the maximum legal rate, according to proof;

D. For equitable and/or injunctive relief according to proof;

E. For an award of punitive damages, according to proof;

F. Compensation for litigation costs, expert witness fees, and attorneys' fees; and

G. Such other and further relief for Plaintiff as may be just and proper.

DATED: November 1, 2016

LOUDERBACK LAW GROUP

By: */s/ Charles M. Louderback*
Charles M. Louderback
Stacey L. Pratt
Attorney for Plaintiff
PAUL GAYNOR

00013837 v8

-14-

COMPLAINT FOR DAMAGES; CASE NO. _____

**DEMAND FOR JURY TRIAL**

Plaintiff Paul Gaynor hereby demands trial by jury on all issues so triable.

DATED: November 1, 2016

LOUDERBACK LAW GROUP

By: */s/ Charles M. Louderback*
Charles M. Louderback
Stacey L. Pratt
Attorney for Plaintiff
PAUL GAYNOR